SAMUEL A. BARKER & al. *versus* INHABITANTS OF DIXMONT.

Towns were not authorized by chapters 226 or 227 of the Public Laws of 1864, to purchase "marine credits" with which to fill their quotas.

Neither does c. 298 of the Public Laws of 1865 ratify such a purchase.

Under a proper article in the warrant, a vote "to raise six thousand dollars for men to fill our quota, and that W. B. F. be a committee to procure men," &c., does not authorize the committee to purchase "marine credits."

A defendant town voted to "accept, and pay S. A. B. $435 each for ten men for three years' service, that S. A. B. give security that those men shall continue in the army three years, unless sooner discharged, or refund the money;"— *Held,* that the vote applied to "men" and not to "marine credits," and that the giving of security was a condition precedent.

BARROWS, J.—The plaintiffs claim that they made with the defendant town a legal contract, for the breach of which they say they are entitled to recover a considerable sum as damages.

What are the terms of this alleged contract?

What is the evidence offered by the plaintiffs to establish it?

In three several counts the plaintiffs substantially set out a furnishing by them of " ten naval or marine recruits *or*

*credits,* allowed as so many towards the quota of the defendant town, January 26, 1865, under an agreement on the part of defendants' agent to pay for each recruit *or credit* thus obtained the sum of four hundred and thirty-five dollars.

While it has been determined by this Court, in the case of *Alley* v. *Inhabitants of Edgecomb,* 53 Maine, 446, that it is no part of the corporate duty of towns, as such, to provide for the public defence, or to raise money to pay bounties or additional wages to volunteers or drafted men, and that they have no authority so to do unless by an express delegation of power to them for that purpose from the Legislature, it cannot be doubted that the supreme lawmaking power of the State may rightfully delegate the necessary authority to the towns, or may ratify and confirm such acts of the towns as the public exigency may seem to have required before the grant of such authority.

The validity of the various enactments confirming the acts and contracts of towns in procuring men for the service of the country by the payment of bounties, and for the payment of recruiting expenses, is not here controverted.

Was the contract which the plaintiffs say they made with the defendants' agent within the scope of such authority or ratification? How did the law stand at the time of the alleged contract?

By c. 227, Laws of 1864, provision was made, in § 1 for the payment by the State of a bounty of $300, subject to certain limitations, to each person who should thereafter enlist and be mustered into the service of the United States on the quota of this State, — and, in § 3, that no person should be entitled to receive from the State *or any town in it* any sum in addition to the bounty provided for in that Act, — and, in § 5, that towns and cities might raise, to be used in paying recruiting agents and other expenses of enlistment, a sum not exceeding twenty-five dollars for each man required of them by any call of the President, — and, in § 6, that any town or city might make temporary provision for

and pay to its recruits the bounty of $300 aforesaid, with right of reimbursement from the State; but payment of a greater sum than $300 per man should operate as a forfeiture of such right to reimbursement in the case of each man so overpaid.

Now, if this could be deemed a contract for the procurement of fresh recruits, it is plain that it was not only not authorized by, but was in direct contravention of the existing law, which prohibited, under a penalty, the payment of more than $300 bounty per man, and $25 to recruiting agents and for expenses of enlistment.

Sections 2, 4 and 6 of c. 226, approved Feb. 20, 1864, (cited by plaintiffs' counsel,) apply only to votes and acts of towns and cities between Feb. 21, 1863, and the date of the Act. The subsequent action of towns was intended to be controlled by c. 227, the provisions of which are as above stated, approved the same day.

Is the want of power cured by the Act of 1865, c. 298, approved Feb. 17, 1865?

Passing over the question whether such *prohibited* action of the towns could be made valid by subsequent legislative ratification, does the Act of 1865, c. 298, cover by its terms such a contract as is here alleged?

By § 1, the past acts and doings of towns in offering, paying or agreeing to pay bounties to those who have been or shall hereafter be mustered into the military or naval service of the United States, and in raising or providing the means to pay such bounties, and all notes and town orders duly issued for the benefit of volunteers, drafted men or substitutes of drafted or enrolled men, thus mustered or to be mustered, are made valid. By § 2, all contracts made by the municipal officers with any volunteer, drafted man or substitute, for the payment of any bounty under a vote of the town or city, and all contracts duly made with third persons, corporations or associations, for the purpose of raising means to pay bounties actually voted are made valid. By § 4, all votes of towns or cities to pay expenses of re-

cruiting for their several quotas, and all contracts made in pursuance of such votes are made valid. In § 6, authority is conferred upon towns, &c., to pay or agree to pay bounties to volunteers, drafted men or substitutes, required to fill their quotas under any call from the President or Government of the United States, where they were actually mustered into the service, and to pay to persons or associations, where they have advanced the bounty or by private subscription given a bounty to such men as were thus mustered in, *with certain restrictions*, prominent among which is the following :— "*Nor shall any bounty be paid by any city, town or plantation, for the assignment to such city, town or plantation, of any person heretofore enlisted or drafted and mustered into the service of the United States, except on subsequent re-enlistment, where such enlisted or drafted man has been or may be credited to the State without the payment of such bounty.*"

Upon examining the proof offered by the plaintiffs of a furnishing by them of "recruits *or credits*," the bearing of this restriction is at once apparent.

The allegations in the plaintiffs' declaration and the proof offered in support of them do not present a case to which either of the ratifying Acts passed by the Legislature in 1864, 1865 or 1866, can apply. We cannot overlook the fact that in each of the counts the plaintiffs make no allegation that they furnished recruits to fill the quota of the defendant town, without coupling with it the qualifying phrase, "*or credits*." The account annexed is for "procuring ten naval or marine recruits *or credits*, &c. In the second count it is alleged that " in consideration that the said plaintiffs agreed and promised the said defendants to procure and have credited to said town in the proper office of the Government ten naval or marine recruits *or credits*, the defendants agreed to pay plaintiffs $435 for each recruit *or credit* thus obtained ;" and the third count sets out a bargain on the part of the plaintiffs " to furnish ten naval or marine recruits *or credits*," and on the part of the defendants " to pay

therefor the sum of $435 for each recruit *or credit* thus furnished." The reiteration is remarkable, and cannot be supposed to be without signification. The proof of performance on the part of the plaintiffs consists of the order from the Acting Assistant Provost Marshal General, dated Jan. 26, 1865, by which it appears that "the following enlisted men of the Marine Corps, *ordered by the Provost Marshal General to be credited to the State of Maine under existing calls,* are hereby credited to the Fourth District as specified herein," appended to which are the names of ten men assigned to Dixmont, together with a transcript from the records (of credits) of the Provost Marshal of the Fourth District, substantially similar. No proof is offered that these men were enlisted under the call to which the meetings and votes of the town of Dixmont related, or that the plaintiffs had procured their enlistment or advanced any bounty to them, or become in any way responsible for any bounty to be paid to the enlisted men in case they should be thus assigned. With much to indicate that the case falls within the restriction in § 6, c. 298, no word of evidence is adduced to control these indications. In fine, notwithstanding the strenuous effort of plaintiffs' counsel to repel the imputation of " paper credits," it is impossible to read the plaintiffs' declaration, and look at the testimony offered, without being satisfied that the transaction was in fact the procurement of the reduction of the quota of the defendant town, by the allowance of credits for men already in the naval service of the United States, and " ordered by the Provost Marshal General to be credited to the State of Maine under existing calls, without the payment of any bounty whatever." The plaintiffs' counsel presents the case truly when he urges that " the State of Maine has had them passed to her credit as a part of the ' 300,000 more' which they were bound to have at the war, — the Fourth District has had them go to reduce their burthen under the same call, — the town of Dixmont has also had them credited on her quota, and thus saved her citizens from the draft which

impended over them." And this is all there is of it. Whether they were credited under such circumstances that a bounty could be legally paid to or for them does not appear. The contract not being authorized by existing laws, it is for the plaintiffs to bring their case clearly within the ratifying Act.

To reduce the quota of the town without adding a man to the effective force in the field, — to save the young and able-bodied citizens of the town from an impending draft by any negotiation except such as would furnish the required number of men, — to substitute the payment of money for the procurement of actual recruits, — it was no part of the design of any of our legislation to compass *such* ends as *these.*

It is needless to remark that towns had, by virtue of their organization in the outset, no power to raise or appropriate money for *such* purposes. No such power was conferred or designed to be conferred by any of the enabling or ratifying Acts respecting the doings of towns and town officers in these matters. Precisely the reverse was contemplated. The sole aim of this species of legislation, throughout the continuance of the rebellion, was to enable the citizens of the State to avail themselves of their municipal organizations to facilitate the ready, full and *faithful performance* of the grave duty which those citizens, collectively and individually, but not in their corporate capacity, owed to the general government. Evasion, commutation, expenditure of money for any other purpose than the procurement of men to fill the army to the required force, were not thought of, — or thought of only to be forbidden. Laws of 1864, c. 226, § 12, — of 1865, c. 298, § 6, above quoted, — of 1866, c. 59, § 4.

Of the men ordered to be credited upon the quota of a State as actually in the service, without the payment of bounty, each district and sub-district was entitled to its due proportion in reduction of its quota, without the payment of money to any person therefor. To open a competition among the sub-districts to secure by means of brokers and

agents the assignment of *more* than this due proportion, in order to avoid the draft, was not only unauthorized by any existing law regulating the powers of municipal corporations, but was directly opposed to the policy of the Acts we have referred to. Towns could enter into no legal or binding contract with any broker or agent for the procurement of such service.

And here the discussion of this case might well cease.

But aside from the want of power in a town to make a valid contract for the performance of such a service as the plaintiffs seem to have rendered here, there are other insuperable obstacles to the maintenance of the suit upon the evidence offered.

There is nothing in the action of the town to indicate that they contemplated the procurement of "credits" merely in reduction of their quota. Everything which they did looks to the procurement of *men*, of *recruits*, — and the alternative provision for "recruits *or credits*" seems to have been introduced by the plaintiffs for the first time, when they came to declare on the contract, in order to correspond with what evidence they had to offer of performance on their own part.

The article in the warrant for the meeting of Jan. 16, 1865, was — "to see if the town will raise *money to pay volunteers or drafted men*, and how much, to fill our quota," &c. And the corresponding vote was — "to raise six thousand dollars for *men to fill our quota*, &c. Chose W. B. Ferguson as *committee to procure men* to fill our quota," &c.

The article in the warrant, for the meeting of Feb. 22, 1865, reads thus, — "to see if the town will raise any further sum of money *to procure volunteer enlistments* to fill the quota of Dixmont under the last call for soldiers." And the town thereupon voted "that we accept, and pay S. A. Barker $435 each for ten *men*," (*not credits*,) "for three years' service; that S. A. Barker give sufficient security that *those men* shall continue in the army three years, unless sooner discharged, or refund the money paid for *those men;*" this latter proviso being utterly inconsistent with the idea

of the procurement of credits for men already in the service. We fear that the mistake as to the name of the contracting party was not the only " misunderstanding" in relation to this matter. Whatever the arrangement between Ferguson and Barker, to furnish ten marine recruits, being enlistments into the marine corps during the war of the rebellion,"—in other words, to furnish and receive " *credits*" in place of recruits, — may have been, it is plain that *the town* was no party to it.

They were prepared to pay $435 each for *ten men* for three years' service, — not for the names of men who had enlisted in the marine corps at some time during the war of the rebellion. Here, in this suit, a claim is made for the furnishing of "ten naval or marine recruits *or credits*," and proof is offered of the furnishing of "*credits*" only. The town may well reply, *non in hæc fœdera veni*.

Moreover the acceptance of the men to be furnished is coupled with a stipulation " that Barker shall give sufficient security that those men shall continue in the army three years, unless sooner discharged, or refund the money" paid for them. This is in the nature of a condition precedent to his receiving the money. It is not even suggested that such security has been offered. This objection, it is true, applies only to the plaintiffs' right to recover upon the strength of the action of the town at the meeting of February 22d, and if the plaintiffs had offered evidence that they had procured, under a contract with Ferguson, *men to fill* the quota of the town, instead of *credits to reduce* it, the action might have been maintained upon the proceedings of the former meeting.

But accepting, as conclusively proved, all that the government records in the case show, in the absence of other evidence, which, (if it existed,) the plaintiffs might readily have produced, the natural presumption is that the names we find upon the list of credits are those of men who were ordered to be credited to the State without the payment of bounty, and so there is an utter failure on the part of the plaintiffs to bring this case within any of the ratifying Acts.

There are two fatal defects in the plaintiffs' case, — want

of proof of an agreement on the part of the town to pay for "credits" instead of men, — and want of power in the town to make a valid contract for the purchase of such credits even had they been so disposed.     *Plaintiffs nonsuit.*

APPLETON, C. J., CUTTING, KENT and DICKERSON, JJ., concurred.

*Paine,* for the plaintiffs.

*J. A. Peters* and *Brown,* for the defendants.